FILED

2024 Jan-23 PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **SUSAN CARTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO.:  6:22-cv-00209-MHH** |
| | } | |
| **MARTIN O' MALLEY,** | } | |
| **COMMISSIONER OF** | } | |
| **SOCIAL SECURITY,**[1] | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

Susan Carter has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. Carter's claim for a period of disability and disability insurance benefits based on an Administrative Law Judge's finding that Ms. Carter was not disabled.  Ms. Carter argues that she is entitled to relief because the Administrative Law Judge—the ALJ— erred in finding that her depression was a non-severe impairment.  Ms. Carter also argues that in formulating her residual functional capacity, the ALJ did not properly assess her subjective symptoms and did not properly consider her non-exertional limitations

---

[1] On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

related to her depression, pain, fecal incontinence, medication side effects, and history of falling. After careful consideration of the administrative record, for the reasons explained below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Carter had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[2]

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited December 18, 2023).

> significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *see* 20 C.F.R. § 416.920. "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Carter applied for a period of disability and disability insurance benefits on June 23, 2020. (Doc. 9-7, p. 5). Ms. Carter alleged that her disability began on April 15, 2019. (Doc. 9-7, p. 5). The Social Security Commissioner initially denied Ms. Carter's claims, and Ms. Carter requested a hearing before an Administrative Law Judge. (Doc. 9-6, pp. 2, 16, 21). Ms. Carter and her attorney attended a telephone hearing with an ALJ on June 23, 2021. (Doc. 9-3, pp. 57-89). A vocational expert testified at the hearing. (Doc. 9-6, pp. 81-88).

The ALJ issued an unfavorable decision on June 30, 2021. (Doc. 9-3, pp. 40-51). On January 12, 2022, the Appeals Council denied Ms. Carter's request for review, (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Carter's Medical Records*

To support her application, Ms. Carter submitted medical records relating to treatment and diagnoses of several medical conditions including back and sacroiliac joint injuries, osteoporosis, osteoarthritis, COPD, fecal incontinence, and depression. The Court has reviewed Ms. Carter's complete medical history and summarizes the following medical records because they are most relevant to Ms. Carter's arguments in this appeal.

### *Back Pain*

Ms. Carter's medical records concerning back pain date to January 12, 2018. On that date, she saw Dr. Farouk Raquib at Winfield Neurology & Family Medicine. (Doc. 9-9, p. 156). Dr. Raquib's notes indicate that Ms. Carter had an anterior cervical fusion in 2008, and she had diagnoses of osteoporosis, scoliosis of lumbar spine, and chronic neck pain. (Doc. 9-9, p. 155). Dr. Raquib's physical examination of Ms. Carter showed left lumbar muscle tenderness and full range of motion. (Doc. 9-9, p. 156). Dr. Raquib ordered a Toradol injection for pain, and he ordered lumbar and thoracic x-rays. (Doc. 9-9, p. 157).

Ms. Carter returned to Dr. Raquib on January 15, 2018 and complained of "severe" and "excruciating" lower back pain that was worse "at the end of the day after working in her office." (Doc. 9-9, p. 151). Ms. Carter reported that Toradol

did not relieve her pain. (Doc. 9-9, p. 151). Dr. Raquib's physical examination showed mild tenderness and spasms in Ms. Carter's lower back and a decreased range of motion of her cervical spine with flexion and extension. (Doc. 9-9, p. 153). An x-ray of Ms. Carter's lumbar spine showed thoracic osteoporosis with mild dextroscoliosis and lumbar osteoporosis with mild degenerative disc change. (Doc. 9-9, p. 151).[3] Dr. Raquib gave Ms. Carter an injection of Decadron and Toradol for her back pain and spasms, prescribed Robaxin as a muscle relaxer, ordered physical therapy and a TENS unit, and ordered an MRI of Ms. Carter's lumber spine. (Doc. 9-9, p. 154).[4]

On January 26, 2018, Ms. Carter returned to Dr. Raquib and complained of lower back pain. (Doc. 9-9, p. 148). Ms. Carter stated that she had started physical therapy, and it "made her very sore." (Doc. 9-9, p. 148). Dr. Raquib noted that Ms. Carter had "pain on palpation of the bilateral lower lumbar paraspinous muscles and bilateral buttocks" and limited range of motion because of pain. (Doc. 9-9, p. 150).

---

[3] "Osteoporosis is a bone disease that develops when bone mineral density and bone mass decreases, or when the structure and strength of bone changes." *See* https://www.niams.nih.gov/health-topics/osteoporosis#:~:text=Osteoporosis%20is%20a%20bone%20disease,of%20fractures%20(broken%20bones) (last visited December 18, 2023). Dextroscoliosis is a form of scoliosis characterized by curvature of the spine to the right. *See* https://my.clevelandclinic.org/health/diseases/24193-levoscoliosis--dextroscoliosis (last visited December 18, 2023).

[4] A TENS unit, or a transcutaneous electrical nerve stimulation unit, "can help to relieve and reduce pain." https://sharedfiles.mayoclinic.org/bedside/ope/GNT-20248283.html (last visited Nov. 3, 2023).

Dr. Raquib diagnosed Ms. Carter with "lumbago with sciatica" on both sides.  (Doc. 9-9, p. 150).  Dr. Raquib ordered a Toradol injection and prescribed Mobic for inflammation.  (Doc. 9-9, p. 150).

Ms. Carter returned to Dr. Raquib on February 7, 2018, and reported that she used her TENS unit daily, attended physical therapy twice a week, and did reasonably well during the day but had unbearable lower back pain in the evenings and poor sleep.  (Doc. 9-9, p. 144).  Ms. Carter reported that she worked full time at H&R Block and could not sit for long periods of time.  (Doc. 9-9, p. 144).  Dr. Raquib's physical exam revealed cervical tenderness and spasms, decreased cervical range of motion, lumbar lordosis, spasm of paraspinal muscles, decreased lumbar range of motion, and pain with lumbar flexion.  (Doc. 9-9, p. 146).[5]  Dr. Raquib also found that Ms. Carter had motor function of 4/5 for lower extremities and "absent" ankle reflexes.   (Doc. 9-9, p. 146).[6]  Dr. Raquib discontinued Ms. Carter's prescription for Robaxin and prescribed Baclofen as a muscle relaxer.  (Doc. 9-9, p.

_____

[5] Lumbar lordosis, or "swayback," is "an increase in the curve toward the front of your body that's naturally part of your cervical and lumbar spine."  *See* https://my.clevelandclinic.org/health/diseases/23908-lordosis (last visited December 18, 2023).

[6] The ankle jerk reflex test, also known as "[t]he Achilles reflex test[,] is performed as part of any complete physical exam, particularly when assessing the neurologic functions of the lower extremities."  A reduced ankle reflex "is usually indicative of LMN [Lower Motor Neuron] disease" or disruption.  *See* https://www.ncbi.nlm.nih.gov/books/NBK459229/ (last visited Nov. 3, 2023).   An "absent" ankle reflex may indicate nerve-root compression.  *See* https://boneandjoint.org.uk/Article/10.1302/0301-620X.78B2.0780276/pdf#:~:text=An%20absent%20ankle%20reflex%20has,%3B%20Dickson%20and%20Butt%201995 (last visited December 18, 2023).

146).  Dr. Raquib noted that his referral for an MRI was "still in progress."  (Doc. 9-9, p. 146).

On February 27, 2018, Ms. Carter returned to Dr. Raquib and complained of back pain that radiated down her right thigh.  (Doc. 9-9, p. 140).  Ms. Carter reported that she was in constant pain that was "bad enough to make her 'cry'" and that she could not get relief when she used hot and cold packs, took an anti-inflammatory, or used her TENS unit.  (Doc. 9-9, p. 140).  Dr. Raquib's physical examination showed cervical tenderness, decreased cervical range of motion, lumbar lordosis, tenderness, and spasms of her lumbar paraspinal muscles bilaterally.  (Doc. 9-9, p. 142).  Dr. Raquib noted that Ms. Carter had decreased range of motion "in all planes," pain with lumbar flexion, motor function of 4/5 in her lower extremities, and "absent" ankle reflexes.  (Doc. 9-9, p. 142).  Dr. Raquib's assessment included disc degeneration of the lumbar region and sciatica on the right side.  (Doc. 9-9, p. 142).  Dr. Raquib prescribed gabapentin and ordered an x-ray of Ms. Carter's sacroiliac joints and a nerve conduction test in her lower extremities.  (Doc. 9-9, p. 142).[7]

Ms. Carter returned to Dr. Raquib on March 27, 2018 and reported pain in her lower back that radiated down her right leg.  (Doc. 9-9, p. 136).  Ms. Carter reported

_____

[7] "Gabapentin works in the brain to . . . relieve pain for certain conditions in the nervous system." Neurontin is a brand name for gabapentin that also appears in Ms. Carter's records.  *See* https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited December 18, 2023).

that she "continue[d] to have physical therapy" and that gabapentin helped her pain. (Doc. 9-9, p. 136).  Dr. Raquib's physical examination revealed the same findings as the February 27 visit.  (Doc. 9-9, p. 138).  Dr. Raquib increased Ms. Carter's gabapentin prescription to 300 mg, discontinued her Baclofen prescription, and again ordered an MRI of her lumbar spine.  (Doc. 9-9, p. 138).

On August 20, 2018, Ms. Carter saw CRNP Courtney Brown at Whatley Health Services, Inc. and reported "persistent" pain in her lower back that radiated to her right buttock and the back of her right knee.  (Doc. 9-9, p. 5).  Ms. Carter reported that the pain began nine months prior; sitting, standing, twisting, and walking aggravated her pain; and pain medications relieved her pain.  (Doc. 9-9, p. 5).  CRNP Brown noted that Ms. Carter had lumbar spine tenderness.  (Doc. 9-9, p. 8).  X-rays of Ms. Carter's lumbar spine showed developing facet arthropathy at L3 and L4-L5 and degenerative disc disease present at L5-S1.  (Doc. 9-9, pp. 8, 96).[8] CRNP Brown noted that Ms. Carter was stable on her gabapentin prescription and indicated the need for a "possible MRI" of her back.  (Doc. 9-9, p. 8).

---

[8] "Facet arthropathy is a form of arthritis affecting joints in the spine." *See* https://stanfordhealthcare.org/medical-conditions/back-neck-and-spine/facet-arthropathy.html#:~:text=Facet%20arthropathy%20is%20a%20form,bones%20that%20form%20your%20backbone (last visited December 18, 2023).  Degenerative disc disease is a condition where the discs between the bones of the spine dry up, causing the bones to get closer together; the stress on the bones and joints from degenerative disc disease can cause growth of bony processes.  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/degenerative-disc-disease (last visited December 18, 2023).

Ms. Carter sought treatment at Fayette Medical Center Emergency Department on November 12, 2018 for pain in her left rib after a fall. (Doc. 9-9, p. 101).[9] Ms. Carter's physical exam revealed normal range of motion and intact sensation in the musculoskeletal system. (Doc. 9-9, p. 103). Ms. Carter rated her pain at 6/10. (Doc. 9-9, p. 103). A "fall assessment" indicated Ms. Carter was at high risk for falls because she had fallen less than three months earlier. (Doc. 9-9, p. 104). Dr. James Blake found Ms. Carter in "mild distress" and reported that Ms. Carter had a normal neurological exam and tenderness in her chest wall and lower ribs. (Doc. 9-9, p. 109). X-rays showed no acute abnormality. (Doc. 9-9, p. 110). Dr. Blake gave Ms. Carter one hydrocodone tablet for pain and directed her to use Motrin the following day if she needed a pain reliever. (Doc. 9-9, p. 111).

On January 24, 2019, Ms. Carter returned to CRNP Brown at Whatley Health for a follow up for back pain. CRNP Brown noted lumbar spine tenderness. (Doc. 9-9, pp. 16-18). Ms. Carter reported that she "lost" Medicaid and that her low back pain prevented her from working a full-time job. (Doc. 9-9, p. 18). CRNP Brown ordered x-rays and gave Ms. Carter a prescription for Neurontin, 300 mg. (Doc. 9-9, p. 18). At an appointment on March 11, 2019, CRNP Brown reviewed Ms.

---

[9] Notes from a January 24, 2019 visit to Whatley Health Services indicate that Ms. Carter fell over a bike on September 21, 2018, and she suffered a fracture. She fell again on November 12, 2018 at home and "hit [the] same place on left side." (Doc. 9-9, p. 18).

Carter's lumbar spine x-ray and increased Ms. Carter's dosage of Neurontin.  (Doc. 9-9, p. 23).

Ms. Carter returned to CRNP Brown on April 18, 2019 for an eye condition and complained of depression and cold symptoms.  (Doc. 9-9, p. 25).  CRNP Brown indicated that she might order an MRI if Ms. Carter's lumbar pain continued.  (Doc. 9-9, p. 28).

On August 8, 2019, Ms. Carter returned to CRNP Brown and reported "worsening" intermittent back pain that she rated at 8/10.  (Doc. 9-9, pp. 31-32).  Ms. Carter indicated that her lower back pain radiated to her right thigh; that sitting, standing, and driving aggravated her pain; that she tried a back brace without relief; and that physical therapy provided no relief.  (Doc. 9-9, p. 31).  CRNP Brown administered a steroid injection for Ms. Carter's back pain and ordered an MRI "to be performed on August 15, 2019."  (Doc. 9-9, p. 33).  CRNP Brown noted a prescription for cyclobenzaprine, a muscle relaxer.  (Doc. 9-9, p. 33).

On August 29, 2019, Mr. Carter reported to CRNP Brown that she had tenderness in her mid and lower back.  (Doc. 9-9, p. 36).  CRNP Brown's notes indicate that she reviewed Ms. Carter's August 15, 2019 MRI, referred Ms. Carter

to a specialist for epidural injections, and recommended that Ms. Carter see a chiropractor.  (Doc. 9-9, p. 37).[10]

On September 17, 2019, Ms. Carter saw chiropractic doctor Raisa Long at Whatley Health Services and reported persistent back pain that she rated at 8/10. (Doc. 9-9, p. 39).  Ms. Carter reported that her lower back pain radiated to her right hip and right leg; that lifting, lying down, and sitting aggravated her pain; and that she could not stand for long periods of time.  (Doc. 9-9, p. 39).  D.C. Long found that Ms. Carter had normal strength in her lower extremities, tenderness in the lumbar spine, and pain in flexion.  (Doc. 9-9, p. 41).  D.C. Long performed chiropractic manipulation and electric stimulation therapy.  Ms. Carter tolerated the treatment well.  (Doc. 9-9, p. 42).

Ms. Carter visited the DCH Health System Emergency Department on September 21, 2019 after she lost her balance, fell, and injured her left arm, ribs, flank, and hip. (Doc. 9-9, pp. 113, 124).  Ms. Carter reported joint pain.  (Doc. 9-9, pp. 121, 125).  X-rays showed no significant findings.  (Doc. 9-9, p. 127).  Dr. Joseph Johnsey prescribed Norco for pain.  (Doc. 9-9, p. 129).

Ms. Carter returned to D.C. Long on October 1, 2019 and complained of lower back pain which Ms. Carter rated at 8/10.  (Doc. 9-9, p. 46).  D.C. Long's physical

---

[10] Other than CRNP Brown's mention of the MRI, the Court could not locate in the administrative record documentation of the August 15, 2019 MRI results.

exam revealed lumbar spine misalignment and tenderness.  (Doc. 9-9, p. 46).  D.C. Long performed chiropractic manipulation and electric stimulation therapy that Ms. Carter tolerated well.  (Doc. 9-9, pp. 46-47).

On October 10, 2019, Ms. Carter sought emergency treatment at Northwest Medical Center after she fell and hit her head on gravel.  (Doc. 9-9, p. 178).  Ms. Carter reported pain in the back of her head and lower back.  (Doc. 9-9, p. 178).  Dr. Martin Hajjar recorded that Ms. Carter had painful range of motion of the lumbar region, decreased flexion and extension, and vertebral tenderness at L2, L3, L4, and L5.  (Doc. 9-9, p. 183).  A CT scan revealed that Ms. Carter had normal alignment in the lumbar spine, mild annular disc bulge at L4-L5, and mild degenerative changes without acute bony process.  (Doc. 9-9, pp. 159, 186).[11]

Ms. Carter again reported back pain on October 29 and December 3, 2019, to Whatley Health providers.  (Doc. 9-9, pp. 49, 51).[12]

---

[11] "Dis[c]s show signs of wear and tear with age. Over time, dis[c]s dehydrate and their cartilage stiffens. These changes can cause the outer layer of the disk to bulge out fairly evenly all the way around its circumference."  *See* https://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428 (last visited December 18, 2023).

Handwritten records of Ms. Carter's follow up appointment at Whatley Health indicate that Ms. Carter had an MRI at the ER, but the Court could not locate records of this MRI in the administrative record.  (Doc. 9-9, p. 49).

[12] Whatley Health's records for Ms. Carter's October and December 2019 visits are handwritten and do not legibly describe Ms. Carter's treatment or identify her provider.

On February 25, 2020, Ms. Carter saw CRNP Abra Richardson at Whatley Health and complained of moderate to severe and worsening back pain that Ms. Carter described as "deep, sharp, and throbbing." (Doc. 9-9, p. 59). Ms. Carter reported that bending, changing positions, lying down, rolling over in bed, sitting, standing, and walking aggravated her pain. (Doc. 9-9, p. 59). Ms. Carter also described a history of steroid injection and epidurals with no relief. (Doc. 9-9, p. 59). CRNP Richardson noted that Ms. Carter was "crying, grimacing and restless" and complained of pain with sitting and standing. (Doc. 9-9, p. 59). CRNP Richardson recorded that Ms. Carter had an antalgic gain and lumbar spine tenderness. (Doc. 9-9, p. 62).[13] CRNP Richardson administered an injection in Ms. Carter's back for pain, prescribed Robaxin for pain, and increased Ms. Carter's dose of gabapentin to 300 mg three times a day. (Doc. 9-9, p. 62).

On April 7, 2020, Ms. Carter saw Dr. Timothy Bassett at Southeastern Spine Specialists and reported "fairly continuous" low back pain. (Doc. 9-10, p. 43). Ms. Carter reported that she had multiple spinal blocks that did not work. (Doc. 9-10, p. 43). Dr. Bassett noted that Ms. Carter had pain at both SI joints; that radiographs showed Ms. Carter had "what appear[ed] to be" osteoporosis; that a DEXA scan

---

[13] "Antalgic gait is one of the most common forms of altered gait in patients presenting to the emergency department and primary care offices. It refers to an abnormal pattern of walking secondary to pain that ultimately causes a limp, whereby the stance phase is shortened relative to the swing phase." *See* https://www.ncbi.nlm.nih.gov/books/NBK559243/ (last visited December 18, 2023).

showed that Ms. Carter was a high risk for fracture; and that an MRI revealed "various spondylitic changes" and showed that Ms. Carter had "a very healthy appearing lumbar spine" for her age. (Doc. 9-10, p. 43). Dr. Bassett reported that Ms. Carter's Gaenslen's test was "very positive," her FABER was "very positive," and her lateral compression was positive. Her AP compression was negative. (Doc. 9-10, p. 43).[14] Dr. Bassett noted that Ms. Carter's pain "could easily be the SI [sacroiliac] joint." (Doc. 9-10, p. 43).

Ms. Carter returned to CRNP Richardson for a follow up on May 5, 2020 and reported persistent, piercing, throbbing lower back pain. (Doc. 9-9, p. 67). CRNP Richardson noted that Ms. Carter had an antalgic gait but was full weight bearing without an assistive device. (Doc. 9-9, p. 70). CRNP Richardson also noted that Ms. Carter was suffering from severe depression. (Doc. 9-9, p. 70).

On May 7, 2020, Dr. Wesley L. Spruill at SpineCare Center gave Ms. Carter a right sacroiliac joint injection. Dr. Spruill indicated in his preoperative diagnosis that Ms. Carter had spinal stenosis at L2-3 and L4-5, disc bulges at L5-S1 and L1-2

---

[14] The Gaenslen's test detects sacroiliac joint abnormalities and involves putting stress on the sacroiliac joint; sacroiliac joint abnormalities "will elicit pain of the stressed joint." *See* https://rheum.med.ufl.edu/physicians-resources/ (last visited January 21, 2024).

The FABER test is a "clinical pain provocation test" involving flexion, abduction, and external rotation of the hip, lumbar, and sacroiliac regions "to assist in diagnosis of pathologies." *See* https://www.physio-pedia.com/FABER_Test (last visited January 21, 2024).

through L4-5, arthritis, and low back pain.  (Doc. 9-9, p. 229).  Dr. Spruill noted that Ms. Carter tolerated the procedure well.  (Doc. 9-9, p. 229).

A May 19, 2020 hand-written record from Whatley Health is mostly illegible, but there is a notation for back pain and for medication refills.  (Doc. 9-9, p. 73).

On June 1, 2020, Dr. Bassett performed a right sacroiliac joint fusion on Ms. Carter.  (Doc. 9-10, pp. 44-45).[15]  Ms. Carter tolerated the procedure "very well."  (Doc. 9-10, p. 45).

At a postoperative appointment on June 16, 2020, CRNP Bailey noted that Ms. Carter's hardware from the procedure was intact, and the implants were in an appropriate position. (Doc. 9-10, p. 41).  Ms. Carter reported that she had done "fairly well" until she got up without her walker and may have put too much weight on the joint.  (Doc. 9-10, p. 41).  She stated that she was in pain.  (Doc. 9-10, p. 41).  At a July 7, 2021 follow-up, CRNP Bailey noted that Ms. Carter was doing "much better" and was showing an increased range of motion.  (Doc. 9-10, p. 40).  She was still using a walker and experiencing pain when she sat or stood for a long period of time.  (Doc. 9-10, p. 40).

---

[15] A sacroiliac fusion is "[a] minimally invasive procedure to stabilize an injured sacroiliac joint and relieve pain."  *See* https://www.yalemedicine.org/conditions/sacroiliac-joint-fusion (last visited December 18, 2023).

On July 21, 2020, Ms. Carter again reported back pain to a Whatley Health provider, and the provider noted Ms. Carter's June 1 procedure and Ms. Carter's continued use of a walker.  (Doc. 9-10, pp. 5-6).[16]

Ms. Carter returned to CRNP Bailey at Southeastern Spine Specialists on August 4, 2020.  (Doc. 9-10, p. 39).  CRNP Bailey reported that Ms. Carter was in physical therapy and could walk 75 feet before she felt she needed her walker for security.  (Doc. 9-10, p. 39).  X-rays showed that the SI joint "appear[ed] to be healing as planned."  (Doc. 9-10, p. 39).  A nerve conduction study showed Ms. Carter had mild right peroneal neuropathy and mild right L5/S1 neuropathy but did not show evidence of widespread peripheral neuropathy.  (Doc. 9-10, pp. 16, 39, 51).  On August 25, 2020, Dr. Bassett noted that the nerve conduction study suggested a possible right peroneal neuropathy and stated that he might consider a peroneal nerve release.  (Doc. 9-10, p. 39).[17]

---

[16] The records from this visit are handwritten and do not legibly describe Ms. Carter's pain or identify her provider.

[17] "[T]he peroneal nerve . . . runs through the front of your legs and extends to your feet and toes. [T]he many people with a peroneal nerve injury develop a foot drop, a walking pattern where you [cannot] properly flex your foot to take a step forward."  *See* https://my.clevelandclinic.org/health/diseases/24263-peroneal-nerve-injury (last visited December 18, 2023).  "Peripheral neuropathy happens when the nerves that are located outside of the brain and spinal cord . . . are damaged."  *See* https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061#:~:text=Overview,functions%20including%20digestion%20and%20urination (last visited December 18, 2023).

On September 1, 2020, Ms. Carter reported to Whatley Health provider Dr. Reginald Whatley that she had fallen the Friday before her appointment. (Doc. 9-10, pp. 115, 119). She also reported chronic lower back pain. (Doc. 9-10, p. 115). X-rays of her foot and lower leg were ordered. (Doc. 9-10, pp. 117, 121, 123).[18]

Ms. Carter returned to Dr. Bassett on September 15, 2020 and reported pain in her right leg that radiated to her toes. (Doc. 9-10, p. 38). Dr. Bassett noted that Ms. Carter did "not have much problem" in "the area" of her SI fusion and that Ms. Carter's pain was consistent with a "sacroiliac distribution of pain." (Doc. 9-10, p. 38). Because of Ms. Carter's "full length of pain down the leg," Dr. Bassett ordered an MRI of Ms. Carter's lumbar spine. (Doc. 9-10, pp. 38, 48). The MRI was performed on September 17, 2020. (Doc. 9-10, p. 46). Later that day, Dr. Bassett noted that the MRI "did not show any significant changes other than the desiccation," showed no subluxation, and showed minimal-to-no nerve compression. (Doc. 9-10, p. 38; *see also* Doc. 9-10, p. 46). The MRI showed mild disc bugling at L2-l3 and L3-L4 and diffuse disc bulge at L4-L5. (Doc 9-10, p. 46).

Ms. Carter returned to Whatley Health on October 20, 2020 for a routine checkup. (Doc. 9-10, p. 113).[19] The doctor who Ms. Carter saw noted chronic low back pain for three years and wrote "I keep falling" and "not sure why she is falling."

---

[18] Some of the records from this visit are handwritten and do not legibly describe Ms. Carter's pain.

[19] The records from this visit are handwritten and do not legibly identify Ms. Carter's provider.

(Doc. 9-10, p. 113).  The doctor wrote that Ms. Carter was using a cane and found mild L5 tenderness.  (Doc. 9-10, p. 113).

On January 7, 2021, Ms. Carter saw Dr. Bassett.  (Doc. 9-10, p. 87).  Ms. Carter reported numbness in the distal portion of her right foot, but Dr. Bassett noted that Ms. Carter's EHL and toe flexion function were intact and that Ms. Carter did not show objective weakness.  (Doc. 9-10, p. 87).[20]  Dr. Bassett noted that Ms. Carter used a cane on her right side and recommended that Ms. Carter attend physical therapy and start exercising.  (Doc. 9-10, p. 87).  Dr. Bassett stated that he saw "no other out for her" and that there was "nothing more [they could] do other than the occasional injection."  (Doc. 9-10, p. 87).  Dr. Bassett gave Ms. Carter injections in her mid-sacral region and her right SI area.  (Doc. 9-10, p. 87).

Ms. Carter saw Dr. Frederick Weber Jr. at a UAB clinic on January 21, 2021 for treatment for gastrointestinal concerns.  Dr. Weber noted that Ms. Carter walked with a cane.  (Doc. 9-10, p. 206).

On January 25, 2021, Ms. Carter saw Dr. Hajjar at Northwest Medical Center because of a fall.  (Doc. 9-10, p. 108).  Ms. Carter complained of lower back pain that radiated to her left hip and down her left leg and weakness in her right leg since

---

[20] "The extensor hallucis longus [EHL] specifically extends the hallux, dorsiflexes the foot at the ankle, and inverts the foot." *See* https://www.ncbi.nlm.nih.gov/books/NBK539875/#:~:text=The%20extensor%20hallucis%20lon gus%20specifically,rupture%2C%20and%20anterior%20compartment%20syndrome (last visited December 18, 2023).

her sacroiliac joint replacement.  (Doc. 9-10, p. 108).  Dr. Hajjar noted that Ms. Carter had moderate pain in her low back, had pain with all range of motion, and demonstrated a positive straight leg test.  (Doc. 9-10, p. 109).[21]

On February 5, 2021, Ms. Carter saw Dr. Murray D. Spruiell at The Orthopedic Center and reported pain and numbness "in an L5 pattern."  (Doc. 9-10, p. 79).  Ms. Carter reported that her pain was "unbearable."  (Doc. 9-10, p. 79).  Dr. Spruiell recorded that Ms. Carter had 5/5 strength in her lower back; intact sensation in her lower back, except for numbness or a tingling sensation in "the L5 pattern"; normal reflexes, except a slight patella reflex on the left side, a patellar reflex in the lower half of normal on the right side, and a small Achilles reflex on both sides; and mildly positive straight leg raise on the left side.  (Doc. 9-10, p. 80).  Dr. Spruiell noted that Ms. Carter had severe tenderness with palpation over "the left hemi sacrum, much more than on the right side," significant low back pain, pain that radiated all the way down her left leg, and numbness in the outside of her left leg. (Doc. 9-10, p. 80).  X-rays of Ms. Carter's back indicated "pretty significant osseous demineralization" and suspected "multilevel dis[c] degeneration."  (Doc. 9-10, p. 80).  Dr. Spruiell noted that the x-rays showed no "severe dis[c] height loss" but

---

[21] "A positive straight leg raising test . . . may correlate with nerve root irritation and possible entrapment with decreased nerve excursion." *See* https://www.ncbi.nlm.nih.gov/books/NBK539717/#:~:text=A%20positive%20straight%20leg%2 0raising,entrapment%20with%20decreased%20nerve%20excursion (last visited December 18, 2023).

indicated "perhaps somewhat disk height loss at L5-S1, as well as [at] T-12-L1 to a mild degree." (Doc. 9-10, p. 80). Dr. Spruiell also reviewed a CT scan from Ms. Carter's emergency room visit on January 25, 2021 and saw no evidence of acute fracture of the vertebral bodies but "some facet spondylosis." (Doc. 9-10, p. 80).[22] Dr. Spruiell ordered an MRI to rule out an occult fracture. (Doc. 9-10, p. 81).

Ms. Carter saw Dr. Boyd Harrison at Jerry Harrison Family Practice on February 10, 2021 and reported pain in the lumbar area, weakness in her legs, falls, and neuropathy. (Doc. 9-10, p. 186). Ms. Carter reported that she took Robaxin, gabapentin, and Norco and could perform her activities of daily living with the pain medication. (Doc. 9-10, pp. 186, 187). Dr. Harrison noted that Ms. Carter had pain on palpation in the lumbar area, that Ms. Carter could not perform her usual activities without her medication, and that Ms. Carter's medication "allow[ed] more activity." (Doc. 9-10, p. 186). Dr. Harrison diagnosed Ms. Carter with lumbar back pain, polyneuropathy, and cramps and prescribed Norco and trazodone. (Doc. 9-10, p. 187). Dr. Harrison discussed "pain management strategies" and cautioned Ms. Carter about "risks of continued use of narcotics," and "diversion, inappropriate use, and doctor shopping." (Doc. 9-10, p. 187).

---

[22] "Spondylosis is an umbrella term for different forms of age-related degeneration of the spine." *See* https://www.neurosurgery.columbia.edu/patient-care/conditions/spondylosis (last visited December 18, 2023).

On February 24, 2021, Ms. Carter had an MRI at Northwest Medical Center that showed "post surgical change in the right SI joint," bilateral facet arthropathy at L4-L5 and L5-S, no lateralized finding towards the left side, no significant disc bulge or canal or neural foraminal stenosis, normal "visualized spinal cord signal" and paraspinal soft tissues, and "no aggressive marrow pathology." (Doc. 9-10, p. 84).[23]

Ms. Carter returned to Dr. Harrison on March 10 and reported a throbbing, constant low back pain and bilateral leg and hip pain. (Doc. 9-10, p. 184). On April 7, 2021, Ms. Carter reported that her pain was stable with her dose of medication. (Doc. 9-10, p. 181). Dr. Harrison noted that Ms. Carter had tenderness, stiffness, limited range of motion, and limited mobility in her back and hips, and no flexion in her back. (Doc. 9-10, p. 181).

Ms. Carter returned to Dr. Harrison on May 5, 2021 and reported back pain. (Doc. 9-10, p. 179). Ms. Carter rated her back pain at 3/10 and reported that she could perform her activities of daily living with pain medication. (Doc. 9-10, pp. 180-181).

---

[23] "Stenosis, which means narrowing, can cause pressure on your spinal cord or the nerves that go from your spinal cord to your muscles." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/lumbar-spinal-stenosis#:~:text=Stenosis%2C%20which%20means%20narrowing%2C%20can,is%20called%20your%20lumbar%20area (last visited December 18, 2023).

*Fecal Incontinence*

On January 15, 2018, Ms. Carter reported fecal incontinence to Dr. Raquib. (Doc. 9-9, p. 151). At the time, she was working full time for H&R Block. (Doc. 9-9, pp. 144, 151). She stated that she had irregular bowel habits and experienced fecal incontinence when she coughed. (Doc. 9-9, p. 151). Dr. Raquib's physical examination was unremarkable. (Doc. 9-9, p. 153). Dr. Raquib referred Ms. Carter to a gastroenterologist for a colonoscopy. (Doc. 9-9, p. 152).

On August 8, 2019, Ms. Carter saw CRNP Brown and reported constipation. (Doc. 9-9, p. 33). Ms. Carter again sought treatment for constipation on August 15, 2019. (Doc. 9-9, p. 37). During her September 2019 visit with a chiropractic doctor, Ms. Carter reported a lax anal sphincter that she needed surgery to correct. (Doc. 9-9, p. 39). During a medical visit on April 7, 2020, Ms. Carter reported fecal incontinence as part of her medical history. (Doc. 9-9, p. 223).

On May 12, 2020, Ms. Carter reported a change in her bowel habits with fecal incontinence to Dr. Joseph Lutrell at Medical West Gastroenterology. (Doc. 9-9, p. 204). Ms. Carter also reported that she underwent "some kind of anorectal procedure for incontinence" seven to eight years earlier. (Doc. 9-9, p. 204). Dr. Lutrell performed a colonoscopy. The results showed that Ms. Carter had mild diverticulosis coli and a "somewhat lax anal sphincter." (Doc. 9-9, p. 205). Dr.

Lutrell prescribed Protonix and fiber supplementation and advised Ms. Carter to avoid non-steroidal anti-inflammatory drugs. (Doc. 9-9, p. 206).[24]

Ms. Carter reported fecal and bladder incontinence on July 21, 2020 to a Whatley Health provider. (Doc. 9-10, p. 5).[25]

On October 28, 2020, Ms. Carter reported trouble with fecal incontinence to CRNP Jeremy Clark at Medical West Gastroenterology. (Doc. 9-10, p. 163). Ms. Carter reported that she had two to three bowel movements per week, with each one followed by several days of incontinence. (Doc. 9-10, p. 163). CRNP Clark referred Ms. Carter to the UAB continence clinic for further treatment. (Doc. 9-10, p. 167).

Ms. Carter saw Dr. Frederick Weber Jr. at the UAB Continence Clinic on January 21, 2021 and reported that she experienced fecal incontinence for several days following a "formed stool bowel matter." (Doc. 9-10, p. 202). Ms. Carter noted that she had similar issues in 2015 prior to a sphincteroplasty and that the issue had started two to three years earlier and had gradually become worse. (Doc. 9-10, p. 202).[26] Ms. Carter also reported that she would leak a small amount of stool with

---

[24] Protonix "is used to treat certain conditions in which there is too much acid in the stomach. [It] is a proton pump inhibitor (PPI). It works by decreasing the amount of acid produced by the stomach." *See* https://www.mayoclinic.org/drugs-supplements/pantoprazole-oral-route/side-effects/drg-20071434?p=1 (last visited December 18, 2023).

[25] The records from this visit are handwritten and do not legibly describe Ms. Carter's symptoms or identify her treating provider.

[26] "[S]phincteroplasty is a procedure used to repair torn or weakened anal sphincter muscles, the muscles that control bowel movements." *See*

every movement and that her stool had a foul odor that distressed her.  (Doc. 9-10, p. 202).  Ms. Carter indicated that her incontinence greatly affected her quality of life and that she was fearful and embarrassed to leave the house.  (Doc. 9-10, p. 202).  Dr. Weber prescribed Ms. Carter colestipol to bulk up her stool.  (Doc. 9-10, p. 207).[27]

In May 2021, Ms. Carter reported to Dr. Harrison that she was having difficulty with constipation.  (Doc. 9-10, p. 180).  Dr. Harrison wrote that Norco, Ms. Carter's opioid treatment for back pain, was causing her constipation, and he prescribed Movantick.  (Doc. 9-10, p. 180).[28]

*Depression*

Ms. Carter first reported symptoms of depression on August 20, 2018, when she saw CRNP Brown at Whatley Health.  (Doc. 9-9, p. 5).  In the eight months preceding August 2018, Ms. Carter's previous primary care provider, Dr. Raquib at

---

https://www.bcm.edu/healthcare/specialties/obstetrics-and-gynecology/urogynecology/anal-sphincteroplasty#:~:text=Anal%20sphincteroplasty%20is%20a%20procedure,muscles%20that%20control%20bowel%20movements (last visited December 18, 2023).

[27] "Colestipol is used to lower high cholesterol levels in the blood. Colestipol works by attaching to certain substances in the intestine. Since colestipol is not absorbed into the body, these substances also pass out of the body without being absorbed." *See* https://www.mayoclinic.org/drugs-supplements/colestipol-oral-route/description/drg-20068621 (last visited December 18, 2023).

[28] Movantick is used for the "treatment of opioid-induced constipation." *See* https://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=300a6474-ebcd-4404-8040-48fdcfcc1635

Winfield Neurology, reported that Ms. Carter was pleasant, demonstrated normal speech and language, and was well-dressed and groomed. (Doc. 9-9, pp. 137, 138, 142, 145, 146, 150, 153 156).

On August 20, 2018, CRNP Brown screened Ms. Carter for depression. (Doc. 9-9, p. 6). Ms. Carter reported that she had little interest or pleasure in doing things; had trouble falling or staying asleep or sleeping too much; felt tired and had little energy at least half of the days in the preceding two weeks; felt down, depressed, or hopeless; felt bad about herself; and had trouble concentrating several of the days in the preceding two weeks. (Doc. 9-9, p. 6). Ms. Carter reported that functioning was "somewhat difficult," and CRNP Brown found that Ms. Carter's depression screening score of 10 indicated that Ms. Carter had moderate depression. (Doc. 9-9, p. 6). CRNP Brown noted that Ms. Carter had normal memory and judgment and appropriate mood and affect. (Doc. 9-9, p. 7).

Ms. Carter returned to CRNP Brown on September 11, 2018 and reported that she was "negative" for anxiety and depression. (Doc. 9-9, p. 12). CRNP Brown noted that Ms. Carter had normal memory and judgment and appropriate mood and affect. (Doc. 9-9, p.13).

On November 12, 2018, Dr. James Blake at Fayette Medical Center Emergency Department observed that Ms. Carter had normal mood and affect. (Doc. 9-9, p. 109). On January 24 and March 11, 2019, CRNP Brown at Whatley

25

Health indicated that Ms. Carter had normal memory and judgment and appropriate mood and affect.  (Doc. 9-9, pp. 18, 22).

Ms. Carter returned to CRNP Brown on April 18, 2019, reported that functioning was "very difficult," and complained of a depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure in doing things, fatigue, feelings of guilt, loss of appetite, restlessness, and "thoughts of death or suicide," but she "denie[d] anxious/fearful thoughts."  (Doc. 9-9, p. 25).  CRNP Brown noted that Ms. Carter scored 24 on a depression screening, indicating that she had severe depression.  (Doc. 9-9, pp. 25-26).  CRNP Brown noted Ms. Carter had normal memory and judgment and appropriate mood and affect during her exam. (Doc. 9-9, p. 28).  CRNP Brown prescribed Ms. Carter Cymbalta for depression. (Doc. 9-9, p. 28).

During an August 8, 2019 appointment with Whatley Health for back pain, CRNP Brown recorded that Ms. Carter was oriented to time, place, person, and situation; demonstrated appropriate mood and affect; and had normal judgment. (Doc. 9-9, p. 33).  On October 1, 2019, D.C. Long at Whatley Health recorded the same.  (Doc. 9-9, p. 46).

When Ms. Carter sought emergency treatment on October 10, 2019 for a fall, Dr. Hajjar at Northwest Medical Center noted that Ms. Carter had "no history of

depression" and did not exhibit signs or symptoms of depression, but he also noted her prescription for Cymbalta.  (Doc. 9-9, pp. 179, 182).

On January 14, 2020, D.O. Motley at Whatley Health observed Ms. Carter to have normal mood and appropriate affect.  (Doc. 9-9, p. 55).  On February 25, 2020, CRNP Richardson at Whatley Health observed the same.  (Doc. 9-9, p. 62).

Ms. Carter returned to CRNP Richardson on May 5, 2020 for treatment of back pain.  (Doc. 9-9, p. 67).  CRNP Richardson noted that Ms. Carter had appropriate mood and affect, but Ms. Carter scored 22 on a depression screening, indicating that she had "severe depression."  (Doc. 9-9, pp. 67, 70).

On October 28, 2020, CRNP Clark at Medical West Gastroenterology reported that Ms. Carter had intact cognitive functions.  (Doc. 9-10, p. 164).  CRNP Clark also observed Ms. Carter to have grossly normal mental status, normal affect, and normal judgment, but Ms. Carter reported depression, anxiety, and difficulty with her memory.  (Doc. 9-10, pp. 165-66).

On February 5, 2021, Dr. Spruiell at the Orthopedic Center reported that Ms. Carter was pleasant and conversant.  (Doc. 9-10, p. 80).

During an initial visit with Dr. Harrison at Jerry Harrison Family Practice on February 10, 2021, Ms. Carter reported anxiety and depression.  (Doc. 9-10, p. 186). Dr. Harrison recorded that Ms. Carter had normal mood and mentation and prescribed Ms. Carter Lexapro for major depression and Trazodone for anxiety.

(Doc. 9-10, pp. 186-87).   On March 10 and April 7, 2021, Dr. Harrison again recorded that Ms. Carter had normal mood and mentation.  (Doc. 9-10, p. 181, 184).

On May 5, 2021, Ms. Carter reported to Dr. Harrison that Lexapro was not working.  (Doc. 9-10, p. 179).  Dr. Harrison changed Ms. Carter's prescription to Wellbutrin.  (Doc. 9-10, p. 180).  He found that Ms. Carter's anxiety was stable. (Doc. 9-10, p. 179).

*Dizziness and Fatigue*

During visits with Dr. Raquib at Winfield Neurology on January 12, January 26, February 7, and March 27, 2018, Ms. Carter denied that she experienced dizziness.  (Doc. 9-9, pp. 137, 145, 149, 156).  Ms. Carter reported to CRNP Brown that she was "positive" for fatigue and/or restlessness on April 18, 2019.  (Doc. 9-9, p. 27).  On August 20 and September 11, 2018 and January 24, March 11, April 18, August 8, and August 29, 2019, Ms. Carter reported to CRNP Brown at Whatley Health that she was not experiencing dizziness.  (Doc. 9-9, pp. 7, 12, 17, 21, 27, 32, 36).

On September 17 and October 1, 2019, Ms. Carter reported no fatigue or dizziness to D.C. Long at Whatley Health.  (Doc. 9-9, pp. 40, 45).  Ms. Carter reported the same to Dr. Motley at Whatley Health on January 14, 2020, and to CRNP Richardson on February 25, March 10, and May 5, 2020.  (Doc. 9-9, pp. 55,

61, 65, 69).  On July 21 and September 1, 2020, Ms. Carter reported the same to Whatley Health providers.  (Doc. 9-10, pp. 5, 115).[29]

Ms. Carter visited CRNP Clark at Medical West Gastroenterology on October 28, 2020, and reported that she was not experiencing dizziness but was having difficulty with her memory.  (Doc. 9-10, p. 165).

Ms. Carter complained of insomnia during her June 2021 visit to Dr. Harrison. (Doc. 9-10, p. 185).

### Dr. Yamir Laboy's Consultative Psychiatric Review

On October 6, 2020, at the request of the Social Security Administration, psychologist Dr. Yamir Laboy reviewed Ms. Carter's medical records and assessed her mental limitations.  (Doc. 9-5, pp. 15-16).  Dr. Laboy noted that Ms. Carter had had no mental health therapy in the two years preceding his review.  Dr. Laboy mistakenly stated that Dr. Bassett of the Spine Center "monitor[ed] mild depressive symptoms each month through dialogue and RX Cymbalta."  (Doc. 9-5, p. 15).[30] Dr. Laboy reviewed Ms. Carter's reported activities of daily living, including Ms. Carter's statements that she had difficulties with bathing and shaving but did not

---

[29] The records from Ms. Carter's visits to Whatley Health on July 21 and September 1, 2020 are handwritten and do not legibly indicate her provider.

[30] The record indicates that CRNP Brown with Whatley Health Services prescribed Cymbalta for Ms. Carter in April of 2019 after Ms. Carter scored a 24 on a health questionnaire, a score that indicated severe depression.  (Doc. 9-9, pp. 28-30).  A Whatley Health record shows that the Cymbalta prescription was refilled in December 2019.  (Doc. 9-9, p. 52).

need special reminders, prepared light meals, went outside alone daily, watched TV six hours a day, read, spent time with others daily, and was irritable with others because of her pain.  (Doc. 9-5, p. 15).

Dr. Laboy indicated that Ms. Carter had a medically determinable impairment that "did not precisely satisfy the diagnostic criteria" for "depressive, bipolar, and related disorders."  (Doc. 9-5, p. 15).  Dr. Laboy found that Ms. Carter had no limitations in the "paragraph B" criteria of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself.  (Doc. 9-5, p. 15).  He concluded that her limitations in her activities of daily living did not indicate "severe mental health challenges."  (Doc. 9-5, p. 16).  Dr. Laboy concluded that there was "no medical evidence to show" Ms. Carter had a severe mental health impairment that precluded her from working.  (Doc. 9-5, p. 16).

### *Dr. Robert Estock's Consultative Psychiatric Review*

On January 5, 2021, at the request of the Social Security Administration, Dr. Robert Estock reviewed Ms. Carter's medical records and assessed her mental limitations.  (Doc. 9-5, pp. 32-33).  Dr. Estock appears to have copied the substantive language from Dr. Laboy's assessment.  (*Compare* Doc. 9-5, pp. 15, 32).  Dr. Estock found that Ms. Carter had mild limitations in each of the "paragraph B" criteria of understanding, remembering, and applying information; interacting with others;

concentrating, persisting, or maintaining pace; and adapting and managing oneself. (Doc. 9-5, p. 32).  Dr. Estock noted that Ms. Carter reported worsening mental health symptoms, but her functioning and activities did not change.  (Doc. 9-5, p. 33).  Dr. Estock concluded that there was "no indication in updated MER of any additional worsening MH complaints."  (Doc. 9-5, p. 33).

### *Ms. Carter's Function Report*

In 2020, at the request of the Social Security Administration, Ms. Carter completed a function report.  (Doc. 9-8, pp. 31-38).[31]  Ms. Carter stated that she lived with family in a home and took care of her grandson who had lived with her since his birth.  (Doc. 9-8, pp. 31-32).  Ms. Carter indicated that she had difficulty dressing herself, bathing, and shaving, that "fecal leakage cause[d] problems with staying clean" because she could not get to the bathroom quickly, and that she did not need reminders to take care of her personal needs and grooming.  (Doc. 9-8, pp. 32-33).  Ms. Carter reported that she prepared frozen meals but could not stand long enough to cook.  (Doc. 9-8, p. 33).  Ms. Carter stated that she tried to go out once a day and could drive or ride in a car for "short trips," but her family shopped for her groceries.  (Doc. 9-8, p. 34).  Ms. Carter reported that she watched TV for six hours a day, read for one-to-two hours per day, and did one small craft each month.  (Doc. 9-8, p. 35).

---

[31] Ms. Carter did not date or sign her function report, but the index for the administrative record indicates that Ms. Carter dated the report "7/16/2020."  (Doc. 9-8, p. 1).

Ms. Carter stated that she texted others daily and needed reminders to attend physical therapy and doctor appointments. (Doc. 9-8, p. 35). Ms. Carter noted that she was "always irritable" because of her pain. (Doc. 9-8, p. 36). Ms. Carter stated that "[her] life ha[d] shrank to [her] bedroom – [she hadn't] been to church, ballgame in months." (Doc. 9-8, p. 35).

Ms. Carter indicated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, and get along with others. (Doc. 9-8, p. 36). She stated that she could lift five pounds, could not squat, could bend "halfway," could stand for five minutes, could reach "straight out," could walk "ten to twenty yards," could sit for 20 minutes, could not kneel, and could take "four steps" on stairs. (Doc. 9-8, p. 36). She stated that she could pay attention for an hour and followed written and spoken instructions "ok." (Doc. 9-8, p. 36). Ms. Carter stated that she did not handle stress well, was afraid of falling, and used a walker that was prescribed in June 2020. (Doc. 9-8, p. 37).

### Ms. Carter's Daughter's Third-Party Function Report

Ms. Carter's daughter, Brittany Carter, completed a third-party function report on July 22, 2020. (Doc. 9-8, pp. 42-50). Brittany indicated that Ms. Carter lived with her nine-year-old grandson in a house. (Doc. 9-8, pp. 43-44). She reported that Ms. Carter took "a long time to dress"; took "short" showers; could not shave; prepared "lots of quick meals, frozen things," but could not cook "big meals"; could

turn on the washer and dryer, but her family "trie[d] to help her with" chores.  (Doc. 9-8, pp. 44-45).  She indicated that, when performing house and yard work, Ms. Carter "needed help" lifting and standing and could not bend or stand for "any period of time."  (Doc. 9-8, pp. 45-46).  Brittany stated that Ms. Carter was awakened at night by back pain and that it was difficult for Ms. Carter to get to the bathroom quickly.  (Doc. 9-8, p. 44).

Brittany reported that her mother could lift only five pounds and could not squat, bend, stand for long times; reach overhead; or kneel.  (Doc. 9-8, p. 48).  She indicated that Ms. Carter could walk "maybe 100 feet" before needing rest, could concentrate for "about an hour," and could follow written and spoken instructions "well."  (Doc. 9-8, p. 48).  Brittany reported that her mother was "hard to get along with" because of her pain and stated that her mother sometimes felt hopeless.  (Doc. 9-8, p. 48).  She stated that other than doctor visits and appointments for physical therapy, Ms. Carter "[didn't] really leave the house much," and Ms. Carter had to have someone with her when she went to doctor and PT appointments because Ms. Carter "ha[d] trouble getting in [and] out of [the] car."  (Doc. 9-8, p. 47).  Brittany reported that her mother had had a walker for about two months and used it all the time.  (Doc. 9-8, p. 49).

### *ALJ Hearing*

The ALJ held Ms. Carter's administrative hearing on June 23, 2021 via telephone.  (Doc. 9-3, p. 57).  Ms. Carter testified that she lived with her ten-year-old grandson and that she did not have trouble maintaining custody of him.  (Doc. 9-3, pp. 73, 80-81).  Ms. Carter reported that her grandson was "a good helper." (Doc. 9-3, p. 81).

Ms. Carter testified that she had worked as a motel manager, a dispatcher for an oil company, a dispatcher for a sheriff's office, a jailer matron, and a front desk person in the 15 years preceding her hearing.  (Doc. 9-3, pp. 64-72).  Ms. Carter stated that between 2014 and 2016, a period when Ms. Carter experienced fecal incontinence so severe it warranted surgery, she worked as a shift supervisor at a residential reentry program.  (Doc. 9-3, p. 70).  She stated that in this job, she spent about half her time sitting and had to lift more than 20 pounds.  (Doc. 9-3, p. 70).

Ms. Carter testified that her back pain and fecal incontinence prevented her from working.  (Doc. 9-3, p. 73).  Ms. Carter described her back pain as "never-ending" and "constant."  (Doc. 9-3, p. 74).  She testified that she could not move her toes and that she experienced shooting pain when she stood or sat for very long. (Doc. 9-3, p. 74).  Ms. Carter stated that her lower back pain moved down her hip, leg, and into her foot.  (Doc. 9-3, p. 74).  Ms. Carter testified that she took Norco twice a day for pain.  (Doc. 9-3, pp. 74-75).  She testified that her medications made

her "a little like dizzy, sleepy" and that without her medication, she could not get up to go to the bathroom.  (Doc. 9-3, p. 75).  Ms. Carter rated her pain at 6/10 with medication and 10/10 without medication.  (Doc. 9-3, p. 75).  Ms. Carter also testified that her condition became worse after she underwent SI joint surgery.  (Doc. 9-3, p. 77).  She testified that she had "done everything every doctor [she] ever went to [had] asked [her]," including going to physical therapy, visiting a chiropractor, and using a TENS unit.  (Doc. 9-3, p. 77).  Despite these treatments, Ms. Carter reported that she could not get from her bedroom to her porch without being scared that she would fall or "give out" before she got there.  (Doc. 9-3, p. 77).

Ms. Carter testified that her fecal incontinence happened randomly.  (Doc. 9-3, p. 75).  She stated that she could go a week and a half to two weeks without bowel movements and then would have a bowel movement followed by "three or four days" where fecal matter would leak if she tried to bend over.  (Doc. 9-3, pp. 75-76).  She testified that her fecal incontinence was embarrassing and that it made it hard "to go anywhere because you're afraid somebody will smell you before you can get back home and take a shower."  (Doc. 9-3, p. 71).  She stated that it hurt for her to drive, but her fecal incontinence made her unwilling to ride with other people.  (Doc. 9-3, p. 76).  Ms. Carter testified that her back pain made her fecal incontinence worse.  (Doc. 9-3, p. 76).  Ms. Carter testified that she wore a pad.  (Doc. 9-3, p. 81).

Ms. Carter also testified that she had significant depression.  (Doc. 9-3, p. 78).
Ms. Carter stated that Dr. Harrison treated her depression and reported that she had
seen a psychiatrist but if she used her Medicaid visits for psychiatry visits, then she
would not have visits available for treatment for her back pain, and she opted for
pain treatment.  (Doc. 9-3, p. 78).  Ms. Carter testified that she had little interest or
pleasure in doing things; was down, depressed, and hopeless; had trouble sleeping;
was tired with little energy; and had trouble concentrating.  (Doc. 9-3, pp. 78-79).

Ms. Carter testified that she had to lie down six hours on average during a
normal workday and that she could sit in a hardback chair or desk chair and stand
for about 15 to 20 minutes before her back started to hurt.  (Doc. 9-3, pp. 79-80).
She testified that she had to use a walker with a seat so that she could sit if she started
to feel weak.  (Doc. 9-3, p. 80).

Ms. Debra Civils, a vocational expert, (Doc. 9-3, p. 81), identified Ms.
Carter's past work as a motel manager as work performed at a medium exertional
level; as a service clerk as work performed at a sedentary exertional level; as a front
desk clerk as light work performed at a medium exertional level; as a jailer as light
work performed at a medium exertional level; and as a combination of jailer and
dispatcher as sedentary work performed at a light exertional level.  (Doc. 9-3, pp.
82-83).  Ms. Civils testified that employers generally tolerated "no more than 10%

off task behavior" in an eight-hour workday and no more than one absence per month.  (Doc. 9-3, p. 84).

The ALJ asked Ms. Civils to consider the work available to an individual with the same age, education, and work experience as Ms. Carter who could perform light work with the following limitations:

> option to sit 30 minutes after every 30 minutes of standing[;]  never climbing ladders or scaffolds[;]   occasionally climbing ramps or stairs[;]  never balancing, as defined by SCO and the Dictionary of Occupational Titles[;]   occasionally stooping, kneeling, [and] crouching[;]  never crawling[;]  never being around hazards such as unprotected moving mechanical parts or unprotected heights[;]  only occasionally tolerating any exposure to occupational atmospheric conditions such dust, fumes, odors, or pulmonary irritants[;] [and] only occasionally tolerating expos[ure] to occupational humidity, wetness, or occupational extremes of cold or heat.

(Doc. 9-3, pp. 84-85).  Ms. Civil testified that the hypothetical individual could perform Ms. Carter's past work as a service clerk because of the sit and stand option. (Doc. 9-3, p. 87).

In the ALJ's second hypothetical, he asked Ms. Civils to assume the limitations in the first hypothetical with the general exertion level changed to sedentary and without a sit stand option.  (Doc. 9-3, p. 86).  Ms. Civils testified that individual could perform Ms. Carter's past work as a service clerk.  (Doc. 9-3, p. 86).

In the ALJ's third hypothetical, he asked Ms. Civils to assume the limitations in the first hypothetical with the added limitation of only performing simple routine

tasks and only occasional in person or face to face contact interaction with the public in work situations.  (Doc. 9-3, p. 87).  Ms. Civils testified that individual could not perform Ms. Carter's past work.  (Doc. 9-3, pp. 87-88).

In the ALJ's fourth hypothetical, he asked Ms. Civils to assume the limitations in the second hypothetical with the added limitations of performing only simple routine tasks and occasional in-person interaction with the public in work settings. (Doc. 9-3, p. 88).  Ms. Civils testified that individual could not perform Ms. Carter's past work.  (Doc. 9-3, p. 88).

### THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision.  (Doc. 9-3, pp. 40-51).  The ALJ found that Ms. Carter had not engaged in substantial gainful activity since April 15, 2019 and that she met the insured status requirements through March 31, 2023.  (Doc. 9-3, p. 42).  The ALJ determined that Ms. Carter suffered from the severe impairments of sphincter disorder; sacroiliac joint disorder; and lumbar degenerative disc disease.  (Doc. 9-3, pp. 42-43).  The ALJ adetermined that Ms. Carter had the nonsevere impairments of gastroesophageal reflux disease, hyperlipidemia, chronic obstructive pulmonary disease, osteoporosis, atherosclerosis, and depression.  (Doc. 9-3, pp. 42-43).

To support his decision that Ms. Carter's depression was nonsevere, the ALJ evaluated Ms. Carter's limitations in the "paragraph B criteria."  (Doc. 9-3, pp. 43-

44).  The ALJ found that Ms. Carter demonstrated no more than mild limitation in the functional areas and that the evidence did not indicate more than a minimal limitation in her ability to do basic work activities.  (Doc. 9-3, p. 44).

Based on a review of the medical evidence, the ALJ concluded that Ms. Carter did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Doc. 9-3, pp. 45-46).  Considering Ms. Carter's impairments, the ALJ evaluated Ms. Carter's residual functional capacity.  The ALJ determined that Ms. Carter had the RFC to perform:

> sedentary work as defined in 20 CFR 404.1567(a) except she [could not] climb ladders or scaffolds; she [could not] occasionally climb ramps and stairs; she [could] never balance as that term is defined by the Selected Characteristics of Occupations in the Dictionary of the Occupational Title; she [could] occasionally stoop, kneel, and crouch; she [could] never crawl; she [could] never work around hazards such as unprotected moving, mechanical parts and unprotected heights; she [could] occasionally tolerate exposure to occupational humidity and wetness; she [could] occasionally tolerate exposure to occupational atmospheric conditions such as dusts, fumes, odors, and pulmonary irritants, and she [could] occasionally tolerate exposure to occupational extreme cold and extreme heat.

(Doc. 9-3, p. 46).  Based on this RFC and relying on the vocational expert's testimony, the ALJ concluded that Ms. Carter could perform her past relevant work as a service clerk.  (Doc. 9-3, p. 50).  Therefore, the ALJ determined that Ms. Carter

had not been under a disability as defined by the Social Security Act.  (Doc. 9-3, p. 51).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and his "'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  *See* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings."  *Costigan v. Comm'r,*

*Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Ms. Carter's Depression*

Ms. Carter challenges the ALJ's determination at step two that her depression was non-severe. (Doc. 15, p. 17). Ms. Carter argues that her depression had more than a minimal impact on her daily life and that the ALJ's assessment of her depression was inconsistent with the records of treating medical professionals. (Doc. 15, pp. 17-18). Ms. Carter argues that CRNP Brown in 2019 and CRNP Richardson in 2020 determined that she had severe depression, (Doc. 15, p. 17; *see* Doc. 9-9, pp. 25-26, 67, 70); that Dr. Weber on January 22, 2021 noted that Ms. Carter's fecal incontinence had "greatly affected her quality of life and that she was fearful/embarrassed to leave the house," (Doc. 15, p. 17) (citing Doc. 9-10, p. 202); and that Dr. Harrison in May 2021 reported that Lexapro was not helping Ms.

Carter's depression,  (Doc. 15, p. 18) (citing Doc. 9-10, p. 179).  Ms. Carter notes that the ALJ found the state agency consultants' psychiatric opinions persuasive, but neither considered the records from CRNPs Brown and Richardson, and neither had Dr. Weber's or Dr. Harrison's records from 2021 because Dr. Laboy made his review in October 2020, and Dr. Estock made his review on January 5, 2021.  (Doc. 15, p. 18 n. 1).

At step two of the sequential analysis, an ALJ identifies a claimant's severe and non-severe impairments.  "This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two."  *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  Because the ALJ determined that Ms. Carter had three severe impairments at step two, the ALJ properly moved from step two to step three of the disability analysis regardless of his classification of Ms. Carter's depression.  *Jamison*, 814 F.2d at 588.

Moreover, for purposes of a disability evaluation, an impairment is not severe if the impairment would "not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"  *Williams v. Soc. Sec. Admin.*, 661 Fed. Appx. 977, 979 (11th Cir. 2016) (quoting *McDaniel v. Bowen*, 800

F.2d 1026, 1031 (11th Cir. 1986)).   In evaluating mental impairments, an ALJ

considers the areas of mental functioning set out in the disability regulations and in

the Listing of Impairments known as the "paragraph B criteria."   20 C.F.R. §

404.1520a; *see* (Doc. 9-3, pp. 43-44).

In the first functional area, understanding, remembering, or applying

information, the ALJ found that Ms. Carter had no limitation. (Doc. 9-3, p. 44).  The

ALJ noted that treating professionals had frequently observed that Ms. Carter

exhibited normal memory. (Doc. 9-3, p. 44) (citing Doc. 9-9, pp. 7, 13, 18, 22, 28).

The ALJ also recognized that Ms. Carter had complained of difficulty with memory

in October 2020 but noted that Ms. Carter's mental status examination was "grossly

normal and her cognitive function was intact."  (Doc. 9-3, p. 44) (citing Doc. 9-10,

pp. 12-73).

In the second functional area, interacting with others, the ALJ found that Ms.

Carter had a mild limitation.  (Doc. 9-3, p. 44).  He noted that treating professionals

frequently observed Ms. Carter to be pleasant and to exhibit normal speech when

interacting in the medical setting.  (Doc. 9-3, p. 44).  The ALJ also noted that treating

professionals had found Ms. Carter to have normal or appropriate mood and affect.

(Doc. 9-3, p. 44).

In the third functional area—concentrating, persisting, or maintaining pace—

the ALJ found that Ms. Carter had a mild limitation.  (Doc. 9-3, p. 44).  The ALJ

recognized that Ms. Carter had reported having trouble concentrating, (Doc. 9-3, p. 44) (citing Doc. 9-9, p. 25), but the ALJ noted that treating professionals had not observed psychomotor issues, distractibility issues, or the need for redirection at Ms. Carter's medical appointments and that treating professionals had frequently observed Ms. Carter to have normal mentation, (Doc. 9-3, p. 44) (citing Doc. 9-10, pp. 179, 181, 184).

In the fourth functional area, adapting or managing oneself, the ALJ found that Ms. Carter had mild limitation. (Doc. 9-3, p. 43). The ALJ noted that treating professionals frequently observed that Ms. Carter was well groomed and dressed and exhibited normal judgment. (Doc. 9-3, p. 44). Because Ms. Carter's depression caused no more than mild limitation in the functional areas, the ALJ found her depression non-severe for purposes of her disability analysis. (Doc. 9-3, p. 44).

The ALJ also noted that the state agency psychological consultants found Ms. Carter to have no more than mild limitations in the "paragraph B criteria" and that both concluded that her depression was non-severe. (Doc. 9-3, p. 44; Doc. 9-5, pp. 16, 33). The ALJ stated that these findings were consistent with the "overwhelmingly normal" mental status examination findings and were consistent with the routine and conservative nature of Ms. Carter's treatment, which was limited to outpatient medication management, and the ALJ found the opinions persuasive. (Doc. 9-3, p. 44).

There are several shortcomings in the ALJ's analysis of Ms. Carter's depression at step two.  The ALJ did not discuss Ms. Carter's April 2019 depression screening on which Ms. Carter scored a 24, indicating severe depression.  In that mental health assessment, Ms. Carter reported to CRNP Brown that functioning was "very difficult" and that she was having difficulty concentrating and was suffering from fatigue.  (Doc. 9-9, pp. 25-27).   The ALJ did not discuss Ms. Carter's depression screening in May 2020 on which Ms. Carter scored a 22, again indicating that she had severe depression.  Notably, though the details of the screening in 2020 do not appear in the record as they do for the 2019 screening, CRNP Brown and CRNP Richardson used the same assessment tool, PHQ-9, (Doc. 9-9, pp. 25-26, 70), so Ms. Carter likely provided information about concentration and fatigue in 2020 to receive another rating of severe depression.   In crediting the consultative evaluations from Dr. Laboy and Dr. Estock, the ALJ did not consider the fact that neither seems to have reviewed Ms. Carter's 2019 and 2020 depression screenings, and neither had available to him Dr. Weber's January 22, 2021 observation that Ms. Carter's fecal incontinence had "greatly affected her quality of life and that she was fearful/embarrassed to leave the house," (Doc. 9-10, p. 202), or Dr. Harrison's 2021 treatment of Ms. Carter for major depression and anxiety, (Doc. 9-10, pp. 179-88). In commenting on the conservative nature of Ms. Carter's treatment, which was limited to outpatient medication management, the ALJ did not mention Ms. Carter's

testimony that she had been advised to see a psychiatrist, but Medicaid limited the number of appointments she could have annually, and she could not afford to see medical doctors and a psychiatrist.  (Doc. 9-3, p. 78); *see Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267-68 (11th Cir. 2015) (explaining that an ALJ "may consider the level or frequency of treatment when evaluating the severity of a claimant's condition," but an ALJ is "specifically prohibit[ed from] drawing any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first obtaining any explanations that the individual may provide.") (internal quotations and citations omitted)*; see also* SSR 16-3p, 2017 WL 5180304, at *9 (stating that an ALJ "will not find an individual's symptoms inconsistent with evidence in the record [for failure to seek medical treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints").

Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotations and citations omitted), the Court cannot determine from the record before it whether the ALJ considered this significant mental health evidence, the incomplete set of records that the psychiatrists used to form their consultative opinions, or Ms. Carter's explanation for her lack of psychiatric treatment.  The Court does not suggest that the ALJ had

to adopt the CRNPs' characterization of Ms. Carter's depression as "severe"; quite the contrary.  In the disability context, the term "severe" has a defined meaning and the classification of an impairment as severe is an issue reserved to the Commissioner under 20 CFR 404.1520b(c).  Still, the ALJ had to consider the findings regarding concentration and fatigue that caused the CRNPs to score Ms. Carter's depression in the severe range on the mental health assessments the CRNPs made as part of Ms. Carter's treatment.

### Ms. Carter's Pain

Ms. Carter also challenges the ALJ's finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical evidence and other evidence in the record.  (Doc. 15, p. 23).  The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019).  When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]."  *Wilson v. Barnhart*, 284 F.3d

1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223).  If an ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.  The Secretary must accept a claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply.  SSR 16-3p states:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and

other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.   Concerning the ALJ's burden when discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)   [the claimant's] daily activities;
>
> (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) [p]recipitating and aggravating factors;
>
> (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Ms. Carter's impairments "could reasonably be expected to cause [her] alleged symptoms" but concluded that the "intensity, persistence and limiting effects of [Ms. Carter's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 9-3, p. 47). The ALJ found that Ms. Carter's statements about the intensity, persistence, and limiting effects of her pain had only partial support in the record given objective imaging results and the conservative nature of her treatment after her SI joint fusion. (Doc. 9-3, pp. 47-49). In reaching his decision, the ALJ cited medical records from several providers at Whatley Health Services, (Doc. 9-3, p. 47); Dr. Devenny and Dr. Blake at Fayette Medical Center, (Doc. 9-3, p. 47); Dr. Raquib and Dr. Waldo at Winfield Neurology & Family Medicine, (Doc. 9-3, p. 47); Dr. Hajjar at Northwest Medical Center, (Doc. 9-3, p. 47); Dr. Timothy Bassett at Southeastern Spine Specialists, (Doc. 9-3, p. 47); Dr. Patterson at Alabama Neurology & Sleep Medicine, (Doc. 9-3, p. 48); and Dr. Harrison at Jerry Harrison Family Practice, (Doc. 9-3, p. 48). The ALJ described Ms. Carter's testimony at the hearing. (Doc. 9-3, p. 47).

The ALJ acknowledged that Ms. Carter had a long history of treatment for chronic back pain before her alleged onset date, (Doc. 9-3, p. 47), but the ALJ noted

that, following her sacroiliac joint fusion, Ms. Carter's treatment for back pain was limited to physical therapy and conservative medication management.  (Doc. 9-3, p. 48).  The ALJ acknowledged that in January 2021, Ms. Carter was still using a cane and that her orthopedic surgeon told her that he had no other treatment options to offer her other than an occasional injection.  (Doc. 9-3, p. 48; *see* Doc. 9-10, p. 87).  The ALJ stated that the medical evidence did not document a cane or other assistive device after January 2021.  (Doc. 9-3, p. 48).

The ALJ stated that following her SI joint surgery, Ms. Carter "did well," gradually increased her weight bearing status, improved her ambulatory distance, and did not have "much problem" in the sacroiliac area in September 2020. (Doc. 9-3, p. 47).  Although Ms. Carter continued to complain of pain, the ALJ noted that a nerve conduction study and electromyography in August 2020 revealed "mild right peroneal neuropathy" and "mild L5/S1 radiculopathy."  (Doc. 9-3, p. 48).  The ALJ pointed to Ms. Carter's September 2020 MRI that showed degenerative disc disease and lumbar spondylosis but no disc herniation or spinal stenosis.  (Doc. 9-3, p. 48).  And the ALJ noted Dr. Bassett's assessment that Ms. Carter's nerve conduction study and MRI results from August 2020 were negative for major significance. (Doc. 9-3, p. 48).

The ALJ remarked that, in January 2021, Dr. Bassett noted that Ms. Carter's sacroiliac joint x-rays still looked "well," that her EHL and toe flexion were intact,

and that she had no objective weakness despite complaints of numbness in the distal portion of the right foot.  (Doc. 9-3, p. 48).  The ALJ noted that when Ms. Carter saw Dr. Spruiell, another orthopedic surgeon, after a fall in January 2021, Dr. Spruiell documented that Ms. Carter had 5/5 strength throughout; intact sensation, except for paresthesia in the L5 pattern on the left side; largely normal reflexes; and a "mildly" positive straight leg test.  (Doc. 9-3, p. 48).

The ALJ cited x-rays of Ms. Carter's lumbar spine that showed suspected multilevel disc degeneration but no severe disc height loss.  (Doc. 9-3, p. 48).  The ALJ considered Dr. Spruiell's assessment of Ms. Carter's spine CT that revealed "some" facet spondylosis but no evidence of acute fracture of the vertebral bodies. (Doc. 9-3, p. 48).  The ALJ noted the MRI of Ms. Carter's spine that showed bilateral facet arthropathy at L4-L5 and L5-S1 but no disc bulge or canal stenosis and no lateralizing finding towards the left side.  (Doc. 9-3, p. 48).  The ALJ also noted that Ms. Carter did not return for treatment with Dr. Spruiell and subsequently sought only primary care with conservative medication management for her back pain. (Doc. 9-3, p. 48).

The ALJ also found that the intensity, persistence, and limiting effects of Ms. Carter's gastrointestinal symptoms were only partially supported by the record because of her infrequent and conservative treatment and because of her work history with similar symptoms.  (Doc. 9-3, p. 49).  In reaching his decision, the ALJ

cited medical records from Dr. Lutrell and CRNP Clark at Medical West Gastroenterology and from Dr. Weber at the UAB Continence Clinic. (Doc. 9-3, p. 49). The ALJ recognized that in May 2020, Ms. Carter underwent a colonoscopy that revealed mild diverticulosis coli and a somewhat lax anal sphincter, and the ALJ noted that Ms. Carter's gastroenterologist prescribed Protonix and fiber supplementation and told Ms. Carter to avoid nonsteroidal anti-inflammatory drugs. (Doc. 9-3, p. 49). The ALJ also noted that, in October 2020, Ms. Carter reported continued incontinence, and her provider referred her to the UAB continence clinic. (Doc. 9-3, p. 49). The ALJ stated that, in January 2021, a provider at the UAB continence clinic prescribed Ms. Carter Colestipol and a proton pump inhibitor. (Doc. 9-3, p. 49). The ALJ added that Ms. Carter did not seek treatment at the clinic after January 2021 and that Ms. Carter did not complain of gastrointestinal problems at later primary care appointments. (Doc. 9-3, p. 49).

With respect to Ms. Carter's work history with fecal incontinence, the ALJ pointed out that Ms. Carter had a remote history of fecal incontinence that improved after internal/external sphincteroplasty in 2015 and that Ms. Carter performed full-time work as a jailer at medium exertion from 2014 through 2016. (Doc. 9-3, p. 49). The ALJ concluded that "the fact that [Ms. Carter] was able to work at a medium exertional level with similar complaints that even warranted surgery at that time suggests . . . that her symptoms now would not preclude work." (Doc. 9-3, p. 49).

The ALJ's discussion of the medical evidence as it pertains to Ms. Carter's subjective reports of pain is mostly accurate. The ALJ did not acknowledge that following her sphincteroplasty in 2015, Ms. Carter complained of fecal incontinence in January 2018 during a visit with Dr. Raquib. (Doc. 9-9, p. 151). At the time, she was working full time for H&R Block. (Doc. 9-9, pp. 144, 151). She stated that she had irregular bowel habits and experienced fecal incontinence when she coughed. (Doc. 9-9, p. 151). Dr. Raquib referred Ms. Carter to a gastroenterologist for a colonoscopy. (Doc. 9-9, p. 151). Therefore, the ALJ's finding that Ms. Carter did not seek specialized care for fecal incontinence until May 2020 after her alleged disability onset date, (Doc. 9-3, p. 49), is incorrect. Additionally, the ALJ's reliance on Ms. Carter's "routine and conservative . . . treatment since her sacroiliac joint fusion" as a basis for discounting her reports of significant back pain does not account for the report from Ms. Carter's orthopedic specialist, Dr. Bassett, that there was nothing more he could do for Ms. Carter "other than the occasional injection" and the recommendation for physical therapy. (Doc. 9-10, p. 87). In other words, conservative treatment was the most Dr. Bassett could offer Ms. Carter for pain relief.

*Non-Exertional Limitations*

Ms. Carter also argues that in formulating her RFC, the ALJ did not consider her non-exertional impairments of depression, pain, fecal incontinence, medication

side effects, and history of falling.  (Doc. 15, p. 28).  As noted, an ALJ considers a claimant's residual functional capacity or RFC at step four of the sequential analysis. A claimant's RFC is the "most [a claimant] can do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a)(1).  In assessing a claimant's RFC, an ALJ must "consider the limiting effects of all ... impairment(s), even those that are not severe." 20 C.F.R. §§ 404.1545(e), 416.945(e).  "The RFC assessment must be based on *all* relevant evidence in the case record" including medical history, reports of daily activities, medical source statements, and the effects of symptoms, including pain. SSR 96-8p at *5 (italics in SSR 96-8p).

In assessing a claimant's RFC, an ALJ must consider the combined effect of the claimant's impairments; an ALJ cannot selectively or separately account for impairments in an RFC and overlook how the impairments collectively impact the claimant's residual functional capacity.  *Schink v. Comm'r of Soc. Sec*., 935 F.3d 1245, 1269 (11th Cir. 2019) (stating that in determining a claimant's RFC, an ALJ must evaluate that "claimant's medical condition taken as a whole"); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 2010) ("It is clear that in this case the ALJ did not consider the combination of Walker's impairments before determining her residual functional capacity. The ALJ made specific reference only to Walker's left ankle and obesity. The ALJ's findings do not mention Walker's arthralgias in the right knee, phlebitis in the right arm, hypertension, gastrointestinal problems, or

asthma, except to the extent that these 'subjectiv[e] complain[t]s do not establish disabling pain.'").

Here, in assessing Ms. Carter's RFC, the ALJ first discussed Ms. Carter's "musculoskeletal disorder symptoms" and then discussed Ms. Carter's gastrointestinal symptoms. (Doc. 9-3, pp. 47-50). The ALJ stated that he "considered all symptoms and the extent to which those symptoms [could] reasonably be accepted as consistent with the objective medical evidence." (Doc. 9-3, p. 46).[32] Based on that assessment, the ALJ found that Ms. Carter could perform sedentary work with additional restrictions. (Doc. 9-3, p. 45).[33]

The ALJ did not consider the combined impact of Ms. Carter's musculoskeletal disorder symptoms and her fecal incontinence. For example, the ALJ reasoned that because Ms. Carter had maintained employment at the medium exertional level between 2014 and 2016 while dealing with fecal incontinence, she should be able to maintain employment at the sedentary level in 2020 while dealing with fecal incontinence. The ALJ wrote:

---

[32] At step two of the sequential analysis, the ALJ wrote that he "considered all of [Ms. Carter's] medically determinable impairments, including those that are not severe, when assessing [her] residual functional capacity." (Doc. 9-3, p. 42).

[33] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

> The claimant has a remote history of fecal incontinence that improved after internal/external sphincteroplasty in 2015 (Exhibit 21F). Notably, during that time from 2014 through 2016, the claimant was performing full-time work as a jailer, which she performed at a medium exertion, earning above the substantial gainful activity threshold (Exhibits 5E and 10D). The fact that the claimant was able to work at a medium exertional level with similar complaints that even warranted surgery at that time suggests to the undersigned that her symptoms now would not preclude work within the above residual functional capacity, especially considering the fact that her treatment recently has been specialized but conservative and infrequent.

(Doc. 9-3, p. 49). In reaching this conclusion, the ALJ did not discuss the extent to which Ms Carter's mobility had deteriorated since 2016, her use of an assistive device (either a cane or a walker), and her recent history of falls. In a July 2020 function report, Ms. Carter's daughter wrote that her mother's "stomach issues [gave] her loose bowels. It[']s hard for her to get to the bathroom quickly." (Doc. 9-8, p. 44). Dr. Harrison associated Ms. Carter's pain treatment with her gastrointestinal symptoms; he diagnosed Ms. Carter's constipation as a side effect of her pain medication. (Doc. 9-10, p. 180).[34] Ms. Carter told several physicians that she had few bowel movements and that several days of fecal incontinence followed a bowel movement. (Doc. 9-9, pp. 151, 204-06; Doc. 9-10, p. 163). From the discussion in his opinion, it does not appear the ALJ considered how Ms. Carter's physical impairments in combination would affect her work. Specifically, it does

---

[34] In treating Ms. Carter for fecal incontinence, Dr. Lutrell advised her to avoid non-steroidal anti-inflammatory drugs, again suggesting a link between Ms. Carter's treatment options for her pain and her fecal incontinence. (Doc. 9-9, p. 206).

not appear that the ALJ evaluated the extent to which Ms. Carter's work would be impacted by difficulty she faced in getting to a restroom because of her slowed mobility.

In addition, in assessing Ms. Carter's RFC, the ALJ did not mention Ms. Carter's depression and anxiety. At the time of her administrative hearing, Ms. Carter was managing her depression and anxiety by taking Wellbutrin and staying at home. (Doc. 9-8, p. 35; Doc. 9-10, p. 202). In his opinion, the ALJ did not discuss how Ms. Carter's return to work as a service clerk might impact her depression and anxiety, particularly when she struggled with fecal incontinence at work. During the administrative hearing, the ALJ did pose a hypothetical to the vocational expert that included a restriction for "occasional in-person, face-to-face interaction with the public in work settings." (Doc. 9-3, p. 88). The VE stated that the restriction on interaction with the public would preclude past work. (Doc. 9-3, p. 88; *see also* Doc. 9-3, p. 87). The ALJ omitted the restriction from the RFC he assigned to Ms. Carter, and he did not mention Ms. Carter's depression and anxiety in his RFC analysis at step four.[35]

---

[35] In his analysis at step two, the ALJ stated: "The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Doc. 9-3, p. 45). This statement and the ALJ's question to the VE regarding interaction with others suggests that the ALJ did not completely ignore Ms. Carter's depression and anxiety at step four, but because the ALJ's discussion of his RFC evaluation is silent as to mental impairments, the Court cannot tell how the ALJ considered those impairments at step four and whether he considered Ms. Carter's mental impairments in combination with her physical impairments.

Though the records of mental health treatment in *Schink* were more extensive than Ms. Carter's records of mental health treatment, the Eleventh Circuit's evaluation of the ALJ's analysis in *Schink* is relevant here.  The Eleventh Circuit explained:

> At step four of the sequential analysis, the ALJ conducts a residual-functional capacity assessment of the claimant, which is "an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)). The ALJ makes this determination by considering a claimant's physical, mental, and other abilities affected by the impairment. *See* 20 C.F.R. § 404.1545(b)-(d). A limited ability to carry out certain mental activities, such as limitations which affect "responding appropriately to supervision, co-workers, and work pressures in a work setting," may reduce a claimant's ability to do past work and other work. *Id.* § 404.1545(c).

> To support his conclusion that Schink was able to return to his past job as a car salesman, the ALJ was required to consider all the duties of that work and evaluate Schink's ability to perform them despite his impairments. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC. *Bowen v. Heckler*, 748 F.2d 629, 634-35 (11th Cir. 1984). The ALJ must also consider a claimant's medical condition taken as a whole. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Phillips*, 357 F.3d at 1237 (ALJ has a duty to consider impairments in combination and to determine whether combined impairments render the claimant disabled); *see also* 20 C.F.R. § 404.1523(c) and Social Security Ruling 96-8p. If an ALJ fails to address the degree of impairment caused by the combination of physical and mental medical problems, the decision that the claimant is not disabled cannot be upheld. *Bowen*, 748 F.2d at 634 ("[I]t is certain that mental and psychological defects can combine with physical impairments to create total disability to perform gainful

> employment." (quoting *Brenem v. Harris,* 621 F.2d 688, 690 (5th
> Cir.1980))).
>
> Here, although the ALJ stated he "considered all symptoms" when
> assessing Schink's RFC, the content of his decision demonstrates he
> did not. Nearly the entire section of the ALJ's opinion relating to RFC
> discusses Schink's physical impairments. For instance, the decision
> discusses at length Schink's obesity, diabetes, right shoulder problems,
> knee pain, and sleep apnea. And while it mentions that Schink had
> bipolar disorder, the decision contains no real discussion of how the
> mental condition affected Schink's RFC.

*Schink*, 935 F.3d at 1268-69.  The Eleventh Circuit continued:

> Even the most favorable interpretation of the ALJ's opinion—namely,
> that the ALJ considered Schink's mental conditions in the RFC
> assessment *sub silentio* and implicitly found that they imposed no
> significant limitations on his work-related mental capacities—would
> not permit us to affirm because, as our precedent holds, the ALJ's
> "failure ... to provide the reviewing court with sufficient reasoning for
> determining that the proper legal analysis has been conducted mandates
> reversal" in its own right. *Keeton v. Dep't of Health & Human Servs.*,
> 21 F.3d 1064, 1066 (11th Cir. 1994). We recognize that in finding
> Schink's bipolar disorder to be a non-severe impairment, the ALJ went
> through the four broad functional areas known as the "paragraph B"
> criteria. But the ALJ also explained that the "limitations identified in
> the 'paragraph B' criteria are *not* a residual functional capacity
> assessment but are used to rate the severity of mental impairments at
> steps 2 and 3 of the sequential evaluation process." As acknowledged
> by the ALJ in his opinion, the mental RFC assessment used at steps 4
> and 5 of the process "requires a more detailed assessment by itemizing
> various functions contained in the broad categories found in paragraph
> B of the adult mental disorders listings in 12.00 of the Listing of
> Impairments." Even if we assume the RFC assessment conducted by
> the ALJ included some silent consideration of Schink's mental
> impairments, we have no way of knowing whether it included the
> "more detailed assessment" required.

*Schink*, 935 F.3d at 1269 (italics in *Schink*); *see also Burgos v. Comm'r of Soc. Sec.*, 705 Fed. Appx. 794 (11th Cir. 2017) (stating that the claimant's physical and mental impairments were related and holding that the ALJ had to consider the claimant's physical and mental impairments in tandem to properly determine the claimant's RFC).

In this case, to support his conclusion that Ms. Carter could return to her job as a service clerk, the ALJ had to consider all the duties of that work and evaluate Ms. Carter's ability to perform them despite her impairments. In other words, the ALJ had to determine whether a 59-year-old claimant with limited mobility, fecal incontinence, and depression and anxiety managed through medication and isolation could interact with co-workers and the public to perform her past work as a service clerk. From the record before it, the Court cannot determine whether the ALJ considered Ms. Carter's physical and mental impairments in combination to determine her RFC. The ALJ did not provide sufficient reasoning to allow this Court to conclude that the ALJ conducted the analysis required at step four to formulate Ms. Carter's RFC. Therefore, the Court must remand this case for additional proceedings.

## CONCLUSION

For the reasons discussed above, the Court remands this case for additional proceedings consistent with this opinion.

**DONE** and **ORDERED** this January 23, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE